panel sitting. First one in satellite locations for all of us. I understand reluctance to go to New Orleans. It worked out, I hope, for the three days we were there. May well know in a week or two if it did. We have two cases on the docket today. The first is 20-5008 United States v. Nunley. And looks like Ms. Barton gets to go first. Good morning. May it please the court. My name is Carly Barton, and I'm here today representing Mr. Keith Nunley on the appeal of his criminal sentence. This case is chiefly about the interpretation and application of the synthetic here today. The first is that the sentencing guidelines do not distinguish between powder and finished synthetic marijuana product for calculating the converted drug weight. Second, that the district court's miscalculation was a harmless error. And lastly, I will be addressing the two level enhancement for maintaining a premise in relation to distributing a controlled substance. To my first point, the sentencing guidelines do not differentiate between chemical powders and finished or usable synthetic marijuana for calculating the guidelines. In order to understand this, we have to get into a little bit about what is synthetic marijuana and how does it become a usable product. There are many different kinds of chemicals that make up synthetic Here we have 5F-MDMB, PICA, PINACA. Some others include AM-2201 or JWH-0818. These chemicals are mixed with a solvent, and then they are sprayed or soaked on leaves. The leaves dry, and then you have a product that's similar to an organic marijuana leaf. It can be ground up, it can be smoked, and it can be used as a Now, instead of trying to keep up with all of these different kinds of chemicals that keep coming out each day, the sentencing commission decided that it was going to take a class-based approach. Prior to the passage of the 2018 amendment to the guidelines, which includes the definition of synthetic marijuana, the courts were left to determine what was the equivalency or analog to all these different chemicals. So instead of trying to do that, the sentencing commission comes up with a definition of synthetic marijuana. And in it, it says that synthetic marijuana is any synthetic substance other than synthetic THC that binds to and activates type 1 cannabinoid receptors. This is the definition of synthetic marijuana. And in this definition, there is no distinction between chemical powders that are recovered or the finished or usable product that are the leaves that happen after. Under this definition of the synthetic marijuana, there is a drug conversion. And in it, it says that one gram of synthetic marijuana is equivalent to 167 grams of converted drug weight. This ratio should seem similar because it is. It is the same ratio that's applied to THC. It is the same ratio that the courts had been applying to synthetic marijuana chemicals in the past prior to the 2018 amendment. Now, this case is different because the district court took an improper interim step in the conversion. It took the powder that was recovered from Mr. Nunley's apartment, multiplied it by 15, and then applied the 1 to 167 ratio. Now, we believe that this is an improper use or does not fall under the guidelines and is not under the definition of what synthetic marijuana is. And we have some cases that are illustrative out of the Fifth Circuit about how to do this calculation. The district court should have proceeded with just the 1 to 167 ratio that is in the guidelines and under the definition of synthetic marijuana. Then, if the court felt that it wished to account for the differences between the recovery of a chemical powder versus a finished or usable product, then it should have used the upward departure in Application Note 27E, which discusses the difference between the finished product and the recovering chemical powders. Was that the objection made at the sentencing? Was that an objection made to the district court? There was an objection made. I apologize, Your Honor. I can't hear you. Was that the objection that was made to the district court? The objection was made that it was an incorrect guideline range calculation because the 15 multiplier happened prior to the 1 to 167 conversion. And the judge did not upwardly depart and was very clear at the sentencing and in his clarification that he did not use Application Note 27E, that he believed that the guideline range was correct with that 15 multiplier. And this case is similar to what happened in United States versus Coss. In that case, Ms. Coss had marijuana butter and the court was trying to determine whether they should use the marijuana guidelines or they should use the THC guidelines. And Ms. Coss attempted to read into the guidelines that a concentration or purity requirement for THC, but that was not there in the definition. In the definition of what the mixture in substance was, it says substances containing a detectable amount of THC. And the court held in Coss that they're going to take the plain language of the sentencing guidelines, that there was just a detectable amount of THC and therefore they're going to apply the 1 to 167 ratio. Here, the district court is trying to do the same thing that Ms. Coss did. They're reading into a concentration multiplier or a purity multiplier that is not in the definition and not in that conversion. They're creating two definitions of synthetic marijuana. Counsel, what's your response to the government's argument in its brief, and I'm sure we'll expect that we'll hear it in a little bit, that these two notes, application note 27, really deal with different situations. One in which the powder is the defendant, the person who's been arrested for this, doesn't seem to be involved in the conversion of the powder and in the process that you described to us helpfully at the beginning of the argument. And the other applies when the person is. I will say a straightforward interpretation of the guideline being applied by Judge Akel would seem to fit here. You're trying to say that two different cannabinoids have to be dealt with under a single one of these two. It does seem to me as at least a fair argument that they apply to different situations. How about that? I think what's happening here is the district court is using application note five in contradiction to the definition of synthetic marijuana and what we see in application note 27E. What do you mean by in contradiction? Is there something about using application note five? I mean, how does that contradict the definition, if that's what you're saying, of cannabinoid substances? It contradicts it because in the application note five is used when there are no drugs seized or when the amount does not reflect the scale of the offense. We would argue that, well, first off, there were drugs seized and those drugs seized were synthetic marijuana. It was synthetic marijuana under the definition of the guideline that the guidelines give us. But second, that the amount seized does not reflect the scale of the offense. In this case, it is reflecting the scale of the offense because that is what the guidelines say synthetic marijuana is. And if we want to get into whether powder or usable substance was or usable product was recovered, then we use application note 27E. And in this case, the judge did not use application note 27E. He did not upwardly depart and do that analysis. He simply relied on the guidelines, but added this 15 multiplier prior to the conversion. Do you have any case law that would show, would support that the explanation being given by the government, you can use application note in this situation dealing with cannabinoids and you can use note 27 in this other situation? Do you have any case law that shows that's not the way a particular court handled the differences? I don't have any specific case law. And honestly, this is a very new sentencing guidelines. So there's not much out there in terms of what is the definition of synthetic marijuana. So I would just tell the court to go back to what's in the sentencing guidelines, that it doesn't make that distinction and it doesn't, when it does distinguish, it's in 27E and it's as part of a upward departure. And that really makes sense when you think about how we came to the synthetic marijuana guidelines. There are very, there's many, many different chemicals with many different potencies, impurities. Impurity can not scientifically be tested yet. We heard the testimony from Detective Gall. It's like separating grains of sand. So when we don't have that technical and the scientific ability, the guidelines say, let's take a class-based approach. We might over-sentence at some points, we might under-sentence at some points, but this is the best we can do to guide the courts in what they should be doing with the synthetic marijuana, the synthetic cannabinoids. And I would also argue, kind of brings me to my second point, even no matter whether that 15 multiplier was done prior or that 15 multiplier was done after, under Application Note 27E, the miscalculation of the guidelines is not a harmless error in this case. Under Ibarra-Luna, the government has that heavy burden to show that it was harmless error. And they can't, they cannot carry that heavy burden in this case. They have to show that the court would have imposed the same sentence had it not made the error. Well, the district court was clearly influenced by this erroneous guideline range. Mr. Nunley was sentenced to 188 months. This is not a round number. It's 15 years and 18 months. It's the bottom of the incorrectly calculated guideline range. This is just like United States v. Martinez-Romero, Rico Mejia, and Juarez. In this case, the improperly calculated guideline range is calling the court's attention to that guideline range to begin with. And you can see it in the sentencing transcript. On page 126 of the record, it says the guideline range sentence is an appropriate sentence. It takes into all the factors of 3553A. He says, I find here that the guidelines got it right. And it is only on the limited remand after he had sentenced Mr. Nunley that the court says that he would have imposed this guideline range, or excuse me, that he said he would have imposed the guideline range regardless of the calculation. So that certainly was a consideration at the time when he was sentencing him. Also, I would point to in that- I'm not quite following the point. It seems to me either at the initial sentencing hearing or on the clarification, the district judge made a pretty definitive statement. I would have imposed that sentence regardless of the guideline. What are you saying the significance or the lesser significance of that is because it was done after he remanded him? I think it's a lesser significance because it wasn't in the record at the initial sentencing guidelines, and it's not- Indicating it was in his mind, though? I mean, we have a lot of implicit findings. You've talked about the U.S. v. Perry case, not today in oral argument, but in briefing, and implicit findings work. Now we have an articulated but late finding. Your Honor, I would just say that it's similar to Martinez-Romero, Enrico Mejia, and Juarez, and in those cases, the court said, hey, we would impose this sentence even if we got it wrong, but it's calling the court's attention to that guideline range. Also, in Judge Yackel's clarification, he says, in finding the appropriate guideline range sentence for possession or distribution of synthetic cannabinoids, the court is not faced with a clear path. And again, he says, the court did not analyze or consider Application Note 27 and did not analyze or impose an upward departure under the guidelines. So we believe that the court is showing you that they're not clear and that they do- he needs guidance from the Fifth Circuit. All right, Ms. Barton. Thank you. We'll see if your friend on the other screen has a different point of view. May it please the court, Elizabeth Berenger on behalf of the United States. The court doesn't need to reach the issue of whether Application Note 5 was the proper methodology to take the undiluted substance- the undiluted nature of the powder into account. This is a sort of textbook case of harmless error. The sentencing commission allows the court to impose a downward departure based on these precise circumstances. And then the district court, when given a second opportunity to explain its reasons, unequivocally stated that it would have given the same sentence under 3553A and that conversely, it would not have given the lower range, the 97 to 121, that did not take the undiluted nature into account because that was an insufficient sentence. So I agree with my colleague that Application Note 27 was sort of the clearest path here. It expressly authorized the court to do what it did. But I'm not sure, as Judge Southwick was saying, that Application Note 5 was totally wrong under the circumstances of this case. This case is somewhat unusual. I thought you were about to interrupt Judge Southwick. Since you gave me that opening, I was going to give you another sentence or two, but let me inject this. I mean, I think you both are, I don't know, Ms. Barton said, and I think it's true, there's not much law on this yet. So I think it's important that we get it as close to right as we can. You do have one of these two potential sources for guidance that clearly applies, and the other one seems more generic. Wouldn't it be helpful, regardless of what happens in this case, for us to articulate how this is supposed to work? I think it's always helpful to give guidance, but I also, this seems like a very specific and unusual case. And let me explain what I mean by that, is that this isn't just a powder case. First, powder cases are pretty unusual. Austin, it was in the record in the sentencing, and I confirmed with the trial attorney. They don't really have a ton of powder cases. I mean, usually they catch it when it's a consumable K2. Lonnie Gall testified at the sentencing hearing that of his 260 state cases, they were all the consumable K2 situations. So not only do we have powder, but we also have an industrial manufacturer of the powder. So Mr. Anomaly is in his apartment. He not only has the powder, but he has the capacity to convert the powder with all of the materials, the acetone, the food safe bags, all of the Damiana leaves. Then he has the finished K2, the consumable product. And then, interestingly enough, he has the stuff in the middle, like the stuff in the trash bag that's just been processed and sprayed. It still smells like acetone. It still, you know, reeks of the acetone. So we clearly know there's much like an Application Note 5, where there's a lab and this sort of capacity to convert. This is not a situation where it's just the powder. So Application Note 5, if we look at it, it says where the amount seized does not reflect the scale of the offense. And so that's a that's a factual finding. Judge Yackel didn't believe that the that just, you know, the powder alone reflected the scale of the offense. And I agree, this is not a typical situation where Application Note 5 is used. I know you're all extremely experienced and knowledgeable about district courts. It's not usually used for these sort of perspective applications. But this is not a case where the court's abusing Application Note 5. He's sort of using it as a proxy for Application Note 27. He's not doing something that the guidelines don't allow him to do. He's doing something in his discretion that the guidelines specifically authorized him to do, which is to sort of take the fact that this is powder and it hasn't been converted yet into account. So, um, Remind me of the development of the PSR. Is there just one PSR and this is the way it was set up there to use Application Note 5? Was there a revised one? I do feel like, if anything, that the pre-sentence report and the government sort of maybe created a diversionary tactic with this Application Note 5 that, you know, that was the path the probation officer initially suggested it. The government suggested it as an alternative to Application Note 27 in its memo. I think they were all grappling with this was probably maybe the first use of this amendment in this division. I couldn't find any other cases where it had been extended other than the one mentioned. So, the division of the district, you mean? Yeah, the Austin division. This was a particular sort of Austin problem in that time period. So, you know, as they're grappling with it and trying to find it, they're trying to make sense. And this makes sense. Nobody wants to hold, treat Mr. Nunley's case like somebody who's caught with 22 kilograms of spice. Like, that doesn't, it doesn't make sense as far as sentencing disparity. It doesn't make sense with what the Sentencing Commission has put into there. I mean, I know Ms. Barton did an outstanding job of explaining the reasons to the amendment, but one of the things that's clear is that we're not treating this as a class-based approach because they're equivalent to THC. We're creating a class-based approach because there's 11,000 different variations that only have one thing in common, and that is its pharmacological effect on the brain, on the CBD receptor. And they can be the same strength as THC. They can be six times the strength of THC, and this is all in the reasons for the amendment. So, courts are not chemists. Like, we, no one could figure this out. It was time-consuming. It was burdensome. So, they just took a tactic. Courts were already applying the THC to these before the amendment. That's what they were doing, is they were just applying the one-to-167 ratio. So, they're like, let's just call it that. It's one-to-167. But that did not constrain the court's ability under both Application Note 27, under its variance ability, under the plain language of Application Note 5, from taking different types of circumstances into account, including this one and the unusual circumstance where we have both a very potent power that is 15 times. I mean, the court didn't just pull this four-level enhancement out of nowhere. It actually based it on testimony from an experienced law enforcement agent that it can make 15 times that amount. And he pretty much really tried to apply the guidelines faithfully in this case. And then he went and, you know, in addition to the powder, we have this sort of—it's rooted in this industrial manufacturing ability that this particular defendant has, that he's not just transporting the powder. He has a lab in his apartment that he's using to convert it. So, under the unique facts of this case, was Application 5 appropriate? I can't say that Judge Ankle did the wrong thing here. Under a different case, where a judge is using Application 5 to sort of contravene what's in the guidelines, that would be a different question that might be clearly erroneous. Let me ask you this. You've talked about harmless error. I don't know if it's harmless or not. That's something we'll have to weigh. If it is, you know, it can—it would be potentially resolved on that level. But going forward, would there—I mean, you said that the probation office, Judge Ankle, government struggle with how to analyze sentencing in this case. Wouldn't it have fit within Note 27A? Couldn't it have been done under 27A? I completely agree. Application Note 27 invites the court to do exactly what it did here. And as far as the harmless error, I mean, the court went back when it clarified its findings and said, I was going to do this no matter how I had to get there. There's this line about it recognizing its sentence under 3553A and an upward departure as a distinction without a difference. So the court is recognizing that whether it got there with Application Note 5, whether it got there with 3553A, whether it got there with the guidelines, just—it was going to give the same sentence because the other sentence was too low to reflect the defendant's conduct. I mean, drugs are a quantity game. That's how we sentence, right or wrong. That's what the court is charged with doing. The greatest difficulty, though, in harmless error here is Martinez-Romero and the part of his sentence that can't be ignored, unignorable, anyway, that is 188 months. And that's the lower end of the improper guide. And in that, what Martinez-Romero says is a smoking gun on it really being unaffected by the improper guideline. And I get that in a normal case that it is troubling when a court says, I made this huge guideline error, but I would have done the same sentence anyways. It's sort of tethered to the guideline. But in this situation, Application Note 27 gave him the ability to do that exact same departure. It's not that—so if he had an error, what, is he just not supposed to take the purity into account? The guidelines say to do that, that he has the authority to do that, invites him to do that when it's not combined with the plant-based material. Excuse me. I didn't quite follow. Are you saying that his authority would include taking into account the improper guideline? Is that what you're arguing? No, I misspoke. I missed a word, and I wasn't sure what you were linking it to. So you're just talking about generally the right discretion of the district court in sentencing, correct? Right. And this wasn't sort of he made an error and said, well, I would have come up with that number anyway, and it's untethered to any sort of facts in the record. This is a case where that four-level enhancement was based on the 15 multiplier. The court wanted to take into account the 15 multiplier. And if it was wrong under Application Note 5, it was certainly authorized under Application Note 27. So using Application Note 5 as a proxy for Application Note 27, this is the most harmless error when the guidelines authorize it in another way. And not just authorize, but sort of encourage a district court to do this in this kind of exact situation that it did. I mean, the powder carries a different set of risks. It carries a different sort of harm. The manufacturing aspect carries a different set of harm. It's not the same crime as someone who has 22 kilograms of powder in their apartment. And I'm not sure if the court has, I know Ms. Barton didn't have a chance to address the other two aspects, but it's just the government's position that the uncontroverted evidence supported the district court's math here. And that the court made a plausible factual finding that, you know, the use was primary and not incidental when he was manufacturing and freshly sprayed drugs in his apartment. So there are no further questions. I would just ask that you affirm the sentence. Back to you, Ms. Barton. Your Honor, the government is arguing that this is not harmless error because Judge Yackel could have given the sentence and authorized the sentence in a different way. That does not make this error harmless. Specifically, Judge Yackel noted that he did not analyze Application Note 27E or any kind of upward variance or upward departure under it. That it is harmless error. I would note that as well, the idea that Mr. Nunley's one bedroom apartment is an industrial lab, while he certainly is capable of, there's certainly evidence that there was manufacturing at some stages in his apartment. It is not a industrial lab. It's a one bedroom apartment in Austin, Texas. So this characterization that it should be considered further under Application Note 5, I believe is inapplicable. In terms of the PSR, Application Note 5 was not included in the PSR until after the objections came through. They did this conversion, this one kilogram of powder to 15 kilograms of finished usable synthetic marijuana. They just did that in the, they just used that conversion based on their talks with Detective Gall and other officers and investigators in it. They used Application Note 5 in an appropriate way, and they used it under the, they used it to convert the cash that was found in Mr. Nunley's apartment into synthetic marijuana. So they have been using Application Note 5 in an appropriate way when we see it as it's meant to be in terms of cash recovered, undercover buys, not see that, where the drugs weren't seized, confidential informant information. That's how they applied Application Note 5. It wasn't until after objections that Application Note 5 was used to convert the one to 15. And Your Honors, we would note that just because a judge would, just because the judge says he's going to give the same sentence does not make this not harmless. That guideline range was chosen because of an incorrect guideline range. Judge Yackel told you that in the record, that the guidelines got it right. And because of that, and because of the analysis that he did not perform under 27E, it makes that incorrect guideline range certainly a harmful error to Mr. Nunley. And these are the reasons why we're asking you to remand for sentencing and to give Judge Yackel the clarification he is seeking in regards to what the definition of synthetic marijuana is, and to look at the plain language of the sentencing guidelines in this case. All right. Thank you both. An interesting case. We'll try to add clarity in whatever direction we go, but one wonders about the Fifth Circuit at times. That concludes our consideration of this case.